RIGGS v. HOT SPRINGS.

Opinion delivered March 17, 1930.

*C. T. Cotham,* for appellant.
*A. T. Davies,* for appellee.

BUTLER, J. The appellant was tried before the circuit court of Garland County sitting as a jury, charged with having violated the occupation tax ordinance of the city of Hot Springs, by failing to pay an occupation tax under item No. 213 of the city ordinance, which item is as follows: "Item 213. Patent Medicine Companies: Meaning those persons or companies that manufacture patent medicines, or agents for patent medicines, $100."

The entire ordinance, which is very lengthy and deals with all of the occupations engaged in the city of Hot Springs, in addition to the item first mentioned, provided that where persons are engaged in business the following schedule should apply as to the amount of tax: This schedule, entitled "schedule A," undertakes to fix occupation taxes for businesses with stock averaging less than $250 at $5, and increases the tax in proportion to the amount of stock up to $200,000 and over, when the tax reaches $550.

Items 91, 92 and 182 of the ordinance are as follows:

"Item 91. Druggist: Each retail druggist or dealer in druggists' sundries. Schedule A."

"Item 92. Druggist: Each wholesale druggist or dealer in druggists' sundries. Schedule A."

"Item 182. Merchandise: Each dealer in any article or articles of line or lines of merchandise not specified in this schedule. Schedule A."

There is no complaint as to the validity of the occupation tax, the contention of the appellant being, first, that the evidence does not show that he comes within the terms of item No. 213, *supra,* and that he was neither a manufacturer of, nor an agent for, patent medicine; second, that that item of the ordinance as enforced was discriminatory, in that it was not attempted to be enforced against others engaged in like business, and for that reason was unenforceable against him; and, third, that the appellant had effected a compromise agreement with the city and its officers by which he was allowed to and did pay $50 a year in full settlement of his occupa-

tion tax due the city, and this agreement had continued through a number of years.

Seven witnesses, including the appellant, testified in the case. From this testimony it developed that the appellant was engaged in business in the city of Hot Springs under the name of Lopez Medicine Company; that his remedy was compounded from roots and herbs grown in various parts of the world and brought to St. Louis by different chemical companies and mixed with alcohol, and sent to the appellant; that he compounded all this into a medicine called "Lopez," mixing it in a laboratory conducted by him, which occupies the entire upstairs of the building known as the Spencer Building; that the medicine is put in containers with labels, and dispensed to the public to be used in the treatment of certain diseases. This remedy has been sold for a number of years in Hot Springs, and was represented to the public as prepared from a secret formula, but the word "cure" was taken out of the advertisement because of governmental regulations. Not including bottles, corks, or things of that kind, but the ingredients only, the average stock carried by appellant out of which the Lopez remedy was compounded amounted to about $300. The amount of sales ranged from ten thousand to fifteen thousand dollars per annum. The medicine has no trademark, and is not protected by letters patent.

From all of the testimony it is fairly inferable that the article compounded and vended by the appellant was prepared from a secret formula, as a medicine for the treatment of certain diseases, put up in packages or bottles, and labeled with a name for immediate use. This was sufficient to constitute it a patent medicine in the sense in which that term is generally used, and in which it was used in the city ordinance in question. While originally the word "patent" was attached to an article, because it was the subject of a patent, it has lost that significance by usage, and has become merely a part of the name of the article, and where any article intended to

be used for medicinal purposes is prepared from a secret formula, and is placed in containers, either packages or bottles, for sale to be used without further preparation, and is labeled so that it may be for immediate use, it is a matter of common knowledge that such remedies are called "patent" or "proprietary" medicines. Certain enamel leather is spoken of as "patent leather," and undoubtedly the word "patent" was originally attached to an article because it was the subject of a patent, but it has lost that significance, and, by usage, has become merely a part of the name of the article. In view of the general use of the word "patent" in this connection, it is employed in the proprietary sense. The natural inference is that the medicine is made according to a secret formula, and not that it is manufactured under letters patent. *Bucham* v. *Jacobs,* 159 Fed. 129, affirmed in 221 U. S. 263, 31 S. Ct. 555. To the same effect, see *State* v. *Donaldson,* 41 Minn. 74, 42 N. W. 78; *State* v. *Kendig,* 133 Iowa 166, 110 N. W. 463; *McHenry* v. *Royal,* 211 Mo. 230, 242 S. W. 147.

As the herbs used in appellant's formula were gathered from various sources by different chemical companies in the city of St. Louis and shipped to the appellant in Hot Springs, and there mixed in his laboratory, he is a manufacturer, under the authority of *Chattanooga Plow Co*. v. *Hays,* 125 Tenn. 148, 140 S. W. 1068, where it is said, "A manufacturer is one engaged in making materials, raw or partly finished, into wares suitable for use."

The effect of the judgment of the trial court was that the ordinance, as applied, did not discriminate, and, as the finding of such court has all the weight of a verdict of a jury, such finding must stand, unless there is no substantial evidence upon which to base it. It was shown that there were perhaps five individuals or corporations in Hot Springs engaged in a similar business to that of the appellant, The Yaqui Medicine Company, Comar Medicine Company, Lower Drug Store, and the Moore Drug

Store, and that these companies had heretofore been paying about the same as the appellant—$50 per year—but the city clerk testified that the city had sought to collect $100 from each of them, and that he did not know why appellant alone had been arrested as the witness was not the collecting officer, and the warrant had been issued by witness at the request of the collecting officer because appellant had refused to pay the occupation tax. At just what time the city decided to collect the full $100 from the above-mentioned individuals and companies is not shown, whether before, at, or after, the time that amount was sought to be collected from the appellant. It was shown that various drug stores handled patent medicines, but it is apparent that these medicines were bought and sold by such stores in the usual course of business, some of them being sold under particular names, such as "Pollard's So Easy," "Hot Springs Liver Buttons," and "Johnson's Cough Syrup"; that this was done for trade purposes. None of these stores are agents for any patent medicine companies but, as stated, buy and sell in the usual course of business, and would be neither manufacturers nor agents under the terms of item No. 213, *supra,* of the ordinance.

Moreover, the contention of the appellant that he was being discriminated against, because the tax was sought to be collected from him and not from others, and that therefore the ordinance as applied would be invalid, cannot be sustained. It would certainly be a novel proposition that the validity of laws and ordinances is to be affected by what police officers and city officials do, or do not do, in regard to their enforcement. If the position of the appellant in this particular was sound, then many of the most wholesome laws might, in par ticular cases, be held to be invalid, because it is a matter of common knowledge that officers clothed with the enforcement of the law not infrequently enforce such law as to some, and not as to others. To sustain his position in this regard, appellant cites 19 R. C. L., § 255, to the

effect that a municipality cannot tax occupations so as to discriminate between persons engaged in the same occupation when the distinction is based upon an immaterial fact, or is an attempt to favor one class at the expense of another, and it "cannot accomplish the same result covertly by enacting an ordinance imposing a license tax, which is fair on its face, and enforce it against one class and persistently fail to enforce it against another class." Only one authority is cited by the author to support the text, and that is a case where the facts have little resemblance to those in the instant case. It is from the Texas Supreme Court, the case of *Hoefling* v. *San Antonio,* 85 Tex. 228, 20 S. W. 85, 16 L. R. A. 608, where the plaintiff set up two private markets upon his own property, and was forced to pay a tax of $75, which he did under protest, and brought suit to recover same because others doing business in stalls at the general market were not required to pay any tax in addition to an amount each paid for the privilege of using a stall. The ordinance, by virtue of which the tax was collected from the plaintiff, is as follows: "The city council may grant to individuals the right of establishing in any designated locality within the city stalls for the vending of meat, granting general market privileges. Each person or firm granted such right shall pay therefor to the market master, for the use of the city, seventy-five dollars per annum, quarterly in advance, and shall post the receipts in a conspicuous place in said stall." The court held, that the failure by the market master to collect $75 from each individual doing business at the public market made the collection from the plaintiff invalid because in conflict with § 1, article 8, of the State Constitution, providing that "the occupation tax levied by any county, city or town, for any year, on persons or corporations pursuing any profession or business shall not exceed one-half of the tax levied by the State for the same period on such profession or business," as the State had not levied any occupation tax, and therefore the tax

attempted to be levied by the city was invalid. This seems to be the question upon which the decision turned, but there is language in the opinion which would seem to support appellant's view, and which was based upon § 2, article 8, of the State Constitution providing that "all occupation taxes shall be equal and uniform upon the same class of subjects within the limit of the authority levying the tax."

In 1 Dillon on Municipal Corporation, § 311, after laying down the rule that inquiry may not be made into the motives governing the Legislature in the enactment of laws, the author, continuing, says: "In analogy to this rule it is doubtless true that the courts will not, in general, inquire into the motives of the council in passing ordinances. But it would be disastrous, as we think, to apply the analogy to its full extent. Municipal bodies, like the directories of private corporations, have too often shown themselves capable of using powers fraudulently, for their own advantage or to the injury of others. We suppose it to be a sound proposition that their acts, whether in the form of resolutions or ordinances, may be impeached for fraud at the instance of persons injured thereby." But in the case of *People* v. *Gardner*, 143 Mich. 104, 106 N. W. 541, the inaccuracy of the rule laid down by Mr. Dillon is clearly pointed out. The court there said: "It is noticeable that he supports the first proposition of his text by the citation of Cooley, Const. Lim. 186, 187, where many cases are collected, but expressed the opinion that 'the acts of a council may be impeached for fraud at the instance of persons injured thereby.' No authority supporting this opinion is cited, except it be the case of *State* v. *Gaslight & Coke Co.*, 18 Ohio St. 262. That case recognizes the rule, and says: 'As the Legislature is a coordinate branch of the government, the jurisdiction of the judiciary to declare its acts of legislation within its constitutional sphere invalid on account of the improper motives which induced their enactment may well be denied. And the same rule should,

perhaps, govern in the case of an ordinance passed by a city council in the exercise of the legislative powers conferred upon it for the purposes of police regulation or municipal government. But this immunity from impeachment for fraudulent motives, or abuse of power, does not attach to all the acts of a city council which may assume the form of an ordinance.' This distinction is sufficient to except the present case from the rule there applied, but the case has little support. The suggestion of Dillon has not received the approval of the courts or jurists of the country.''

Mr. Cooley, in his work on Constitutional Limitation, 6th edition, page 220, states the rule broadly that the motives of the Legislature cannot be inquired into, but the courts must presume that they were passed for proper reasons, and, continuing on page 257, uses the following language: ''And the same presumption that legislative action has been devised and adopted on adequate information, and under the influence of correct motives, will be applied to the discretionary action of municipal bodies, and of the State Legislature, and will preclude, in the one case as in the other, all collateral attack.''

With the exception of the authority cited by appellant, *supra,* and Dillon on Municipal Corporations, *supra,* it appears that the great weight of authority is to the effect that the validity of an ordinance cannot be questioned because of any alleged improper motive of the city authorities in the enactment of the same, either as shown by any circumstance prior to, or attending, the enactment or any circumstance regarding its application, and that the failure of the authorities to properly enforce the ordinance, or to enforce it against some and not against others, is no defense in a prosecution for its violation. *Chimine* v. *Baker,* 32 Tex. Civ. App. 520, 75 S. W. 330; *Hines* v. *Bay City,* 115 Mich. 204, 73 N. W. 116; *Centralia* v. *Smith,* 103 Mo. App. 438, 77 S. W. 488. Neither is it any defense that the city authorities acquiesced in the payment of a less sum than that due under the or-

dinance, or that by agreement appellant and others paid for a number of years the sum of $50 when under the ordinance they should have paid $100. The authorities *supra* support this, and to the same effect see also *Poe* v. *Gardner,* 143 Mich. 104, 106 N. W. 541; *Alexander* v. *Greenville,* 54 Miss. 659.

It follows that the appellant was engaged in the manufacture·of a patent medicine, that as such he was liable for the payment of the occupation tax under item No. 213, *supra,* that the facts as found by the trial court failed to show any discrimination in fact against the appellant and in favor of others, that, had there been such discrimination, this would be no defense, nor would it be a defense that the appellant had for some years past compounded with the city officials for a less sum than that actually due the city.

Judgment affirmed.

HUMPHREYS and KIRBY, JJ., dissent.

HUMPHREYS, J.   I dissent because the medicine compounded and sold is not a patent medicine within the meaning of the statute.